**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

| | |
|---|---|
| CHARLES SMITH, ET AL. | CIVIL ACTION NO. 25-0123 |
| VERSUS | |
| | JUDGE ALEXANDER C. VAN HOOK |
| CLEAR BLUE INSURANCE COMPANY | MAGISTRATE JUDGE LEBLANC |

## MEMORANDUM RULING

Charles Smith obtained a state court judgment following a traffic accident with Stanley Ceasar, Jr., and the underinsured motorist carrier for Smith's employer paid a portion of that judgment. In this case, Smith filed a bad faith action purportedly on Ceasar's behalf against Ceasar's liability insurer, Clear Blue Insurance Company ("Clear Blue"), for failing to timely settle within the policy limits and exposing Ceasar to an excess judgment. Clear Blue answered and asserted that it's entitled to a credit for the payment that Smith's underinsured motorist carrier made, which satisfied part of the state court judgment. Now, Smith has filed a motion for partial summary judgment to prohibit Clear Blue from receiving that credit if his bad faith action is successful. For the reasons below, the motion is denied.

### Background

In November 2018, Charles Smith and Stanley Ceasar, Jr. had a violent truck collision. *See* Record Document 31-5 at 2. Ceasar, driving a dump truck, made an abrupt turn across Smith's traffic lane, causing Smith to crash into the driver's side of Ceasar's truck. *Id.* At the time of the collision, Smith had been driving a tanker

1

truck for his employer, Wastewater Specialties, Inc. ("Wastewater"). *Id*. Smith suffered substantial injuries from the collision, including brain, neck, back, and shoulder damage, requiring multiple surgeries. *Smith v. Ceasar*, No. 23-689 (La. App. 3 Cir. 6/26/24), 389 So. 3d 1037, 1047-48.

After the collision, Smith and his wife, Jodenise Smith, filed a petition for damages in state court against Ceasar. Record Document 31-5 at 1. The petition also named two insurers: Clear Blue and National Union Fire Insurance Company ("National Union"). *Id*. Clear Blue issued an automotive liability policy to Ceasar with liability limits of $500,000. Record Document 31-5 at 1. National Union issued an insurance policy to Wastewater, and Smith alleged that this policy included underinsured motorist coverage. *Id*. After a motion for summary judgment, Smith dismissed his claim against National Union. Record Document 31-8 at 1.

Eventually, Smith amended his original petition to add another insurer, Indian Harbor Insurance Company ("Indian Harbor"). Record Document 31-6 at 1. Indian Harbor issued a commercial excess policy to Wastewater with liability limits of $10,000,000. Record Document 26-4 at 11. This policy included an underinsured motorist provision. *Smith*, 389 So. 3d at 1059 (holding Indian Harbor's underinsured motorist rejection form was invalid).

Trial occurred in October 2022, and a jury found Ceasar was 100% at fault for the collision and awarded total damages of $5,107,609.23. Record Document 1-2 at 2. The trial court entered a final judgment, apportioning damages between Clear Blue, Ceasar, and Indian Harbor. *Id*. The final judgment allocated $468,426 against Clear

2

Blue, which exhausted its policy limits. *Id.*; Record Document 31-2 at 2 (explaining that a prior property damage claim had reduced the available limit). The final judgment also assigned $1,000,000 against Ceasar individually and $3,552,113.91 against Ceasar and Indian Harbor solidarily. Record Document 1-2 at 2.

After the final judgment, Clear Blue paid Smith $708,995.47. Record Document 31-2 at 2. This payment satisfied the $468,426 judgment against Clear Blue and included legal interests and costs. *Id.*

On April 5, 2024, Ceasar and Smith purportedly executed a Compromise Agreement. Record Document 32-1 at 7. In the Compromise Agreement, Ceasar assigned Smith the right to bring a bad faith action against Ceasar's insurer, Clear Blue. *Id.* at 3. In exchange, Smith agreed to not pursue Ceasar's assets for satisfaction of the final judgment. *Id.* The Compromise Agreement also included the following language:

> [Ceasar] acknowledges that this Agreement is not a settlement, release, or anything other than a conditional agreement related to financial responsibility and a covenant not to execute the judgment against [Ceasar] except as necessary to secure any proceeds recovered through prosecution of the bad faith action. *Id.* at 5.

On December 13, 2024, Smith filed the current action against Clear Blue for violating Louisiana Revised Statute 22:1892. Record Document 1-1 at 5. According to Smith, Clear Blue acted in bad faith when Clear Blue did not make a timely offer to settle the tort lawsuit for its policy limits. *Id.* In the petition, Smith alleged that Ceasar had assigned Smith the right to bring the bad faith cause of action. *Id.* As

damages, Smith sought statutory penalties, attorney's fees, and liability for the excess judgment. *Id.*

Meanwhile, on January 10, 2025, Smith and Indian Harbor executed a Receipt and Release. Record Document 31-13 at 1. In the Receipt and Release, Indian Harbor agreed to pay Smith $4,000,000 "in full and final settlement of all claims against [Indian Harbor]." *Id.* Furthermore, a recital of the Receipt and Release stated that their agreement "releases and terminates all rights, obligations and liabilities of [Indian Harbor]."

The Receipt and Release also contained two provisions related to the construction of their agreement, stating that it should not "be construed as a waiver, modification or retraction of the positions of the parties relative to the interpretation and application of any insurance policy issued by [Indian Harbor]." *Id.* at 2. In addition, Indian Harbor and Smith agreed that "[t]his agreement does not reflect upon the parties' views as to rights and obligations with respect to matters or persons outside the scope of the Agreement." *Id.*

After the Receipt and Release, Indian Harbor issued a $4,000,000 payment to Smith. Record Document 31-14 at 2. Smith then filed an acknowledgment of satisfaction of judgment in state court. Record Document 31-4 at 1. In the acknowledgment, Smith explained that Indian Harbor had sought appellate review of the final judgment, and in lieu of continued litigation, the parties agreed to $4,000,000 "in full satisfaction of the trial court's judgment against Indian Harbor." *Id.*

Eventually, Clear Blue removed Smith's petition to this court and filed its answer. Record Documents 1 and 15. In the answer, Clear Blue asserted as an affirmative defense that Clear Blue is entitled to a credit or offset for any payments Smith had received from an underinsured motorist carrier, including Indian Harbor. Record Document 15 at 13-14. Smith has now filed a motion for partial summary judgment to prohibit Clear Blue from receiving a credit or offset if his bad faith claim succeeds. Record Document 16.

## Standard

Federal Rule of Civil Procedure 56(a) requires a court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When the burden at trial will rest on the nonmovant, the movant need not produce evidence to negate the elements of the nonmovant's case; rather, it need only point out the absence of supporting evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the movant satisfies its initial burden, the nonmovant must demonstrate a genuine dispute exists by "going beyond the pleadings" and "designating specific facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). This burden requires more than metaphysical doubt, conclusory or unsubstantiated allegations, or a mere scintilla of evidence. *Id.* Finally, the familiar "burden-shifting scheme does not vary where the movant is the plaintiff challenging the nonmovant's affirmative defense[.]" *Serna v. Law Office of Joseph Onwuteaka, P.C.*, 614 F. App'x 146, 155 (5th Cir. 2015).

## Analysis

A liability insurer represents the interests of its insured and has a duty to act in good faith and deal fairly when handling claims. La. R.S. 22:1892. That duty includes "protect[ing] the insured from exposure to excess liability." *Smith v. Audubon Ins. Co.*, 95-2057 (La. 9/5/96), 679 So. 2d 372, 376. If the insurer violates its duty of good faith and fair dealing, the insurer becomes liable for an excess judgment rendered against the insured. *Id.* (collecting cases); *see also Kelly v. State Farm Fire & Cas., Co.*, 2014-1921 (La. 5/5/2015), 169 So. 3d 328, 337 (explaining "[t]he availability of a cause of action for insureds to recover from a judgment in excess of policy limits has a long lineage[.]").

In this case, Smith does not seek to recover directly for his own damages, but instead, asserts Ceasar's right of action against his insurer, Clear Blue, for acting in bad faith when it failed to timely settle and exposed Ceasar to an excess judgment. Record Document 1-1 at 5. However, as a threshold matter, Clear Blue argued that a genuine dispute exists whether the Compromise Agreement assigning Ceasar's bad faith action to Smith is valid. Record Document 31 at 23-25.

Generally, an insured tortfeasor can assign the right to pursue his insurer for bad faith to the injured plaintiff. *Smith v. Citadel Insurance Co.*, 2019-00052 (La. 10/22/19), 285 So. 3d 1062, 1065 ("[T]he assignment of an insured's cause of action resulting from the insurer's bad faith is permissible under [Louisiana Civil Code] Article 2642."); *see Kelly*, 169 So. 3d at 334 ("[W]e must emphasize that Kelly does not seek to recover directly for his own damages. Instead, Kelly has been assigned

6

Thomas' causes of action…for State Farm's actions which allegedly subjected Thomas to [an excess] judgment."); *see, e.g., Morgan v. American Ins. Co.*, No. 16-13900, 2017 WL 479528, at *3 (E.D. La. Feb. 6, 2017) ("The Court finds that assignment of bad faith claims is consistent with the general principle that 'all rights may be assigned[.]'").

Clear Blue raised two arguments for denying summary judgment based on an invalid assignment of rights. First, Clear Blue argued that the insurance policy with Ceasar prohibited the transfer of his rights without its written consent. Record Document 31 at 24. Specifically, the policy between Clear Blue and Ceasar stated: "Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured." Record Document 31-2 at 2. According to Clear Blue, it never provided Ceasar with written consent to transfer his bad faith cause of action to Smith, and therefore, the Compromise Agreement is invalid. Record Document 31 at 24. The Court is not persuaded.

An insurer, like Clear Blue, can prohibit post-loss assignment of rights as part of the insurance policy with its insured. *In re Katrina Canal Breaches Litigation*, 2010-1823 (La. 5/10/11), 63 So. 3d 955, 963. But the Louisiana Supreme Court has made it clear that such a prohibition must be "clear and explicit." *Id.* ("Although we hold that parties may contract to prohibit post-loss assignments, we also hold the contract language must clearly and unambiguously express that the non-assignment clause applies to post-loss assignments."). As the Louisiana Supreme Court has explained, "[i]nsurance is a highly regulated industry, and insurers are well aware of

7

the distinction between pre-loss and post-loss assignments…the insurer must include language making it clear and explicit that post-loss assignments are prohibited under the policy." *Id.*

The insurance policy between Clear Blue and Ceasar does contain an anti-assignment clause: "[y]our rights and duties under this policy may not be transferred without our written consent…" Record Document 31-2 at 2. But this policy language is general, not specific. Clear Blue's policy included no language, much less "clear" language, that prohibited the insured from making a post-loss assignment of rights. Other courts have considered similar language and found it insufficient to prohibit post-loss assignments of rights. *See, e.g.*, *I Say I Say I Say, LLC v. Auto. Ins. Co. of Hartford, Conn.*, No. 23-5116, 2024 WL 3639526, at *4 (E.D. La. Aug. 2, 2024) (rejecting "Assignment of this policy will not be valid unless we give our written consent[.]"); *Morgan*, 2017 WL 479528, at *3 (same).

Clear Blue failed to address this jurisprudence, and that failure is telling because Smith raised this argument in his reply memorandum and Clear Blue requested, received leave, and then filed a sur-reply. *Compare* Pl.'s Reply, Record Document 32 at 5, *with* Def.'s Sur-Reply, Record Document 36. As the Louisiana Supreme Court has recognized, Clear Blue operates in a highly regulated industry, and therefore, is aware of the need for clear and unambiguous language to prohibit post-loss assignments of rights but did not include that language in its policy with Ceasar. *In re Katrina Canal Breaches Litigation*, 63 So. 3d at 963. Therefore, Clear

8

Blue's argument that Ceasar's policy prohibited a post-loss assignment of rights is unavailing.

Alternatively, Clear Blue argued that summary judgment is premature because Smith did not produce the Compromise Agreement with Ceasar until its reply memorandum in support of the pending motion for summary judgment. Record Document 36 at 2. Clear Blue argued that such late production meant it has not been able to test the authenticity and effect of the Compromise Agreement in discovery. *Id.* Smith does not address the untimeliness of his production other than to acknowledge that it has now been produced. *See* Record Document 32 at 1 n. 1 ("Plaintiffs produced the assignment to Defendant in response to Requests for Production."). The Court finds that Smith's delayed production has denied Clear Blue the opportunity to use the tools of discovery to investigate the Compromise Agreement, and as such, Clear Blue may re-urge arguments related to the Compromise Agreement, including its effectiveness, in a future motion depending on the outcome of its discovery.

Based upon this reasoning, the Court could deny Smith's motion for partial summary judgment as premature, but instead, the Court will address the merits of Smith's argument that Clear Blue is not entitled to a credit for Indian Harbor's underinsured motorist payment.

Whether a liability insurer, like Clear Blue, can obtain a credit for the payment of an underinsured motorist carrier, like Indian Harbor, depends on the existence of a solidary obligation between them. Louisiana Civil Code Article 1794 states that

9

"[a]n obligation is solidary for the obligors when each obligor is liable for the whole performance. A performance rendered by one of the solidary obligors relieves the others of liability toward the obligee."

The Louisiana Supreme Court has consistently found that a solidary obligation exists between a tortfeasor's liability insurer and a tort victim's underinsured motorist carrier. *Hoefly v. Gov. Employees Ins. Co.*, 81-2770 (La. 6/21/82), 418 So. 2d 575, 579; *Fertitta v. Allstate Ins. Co.*, 83-2294 (La. 1/14/85), 462 So. 2d 159, 162; *Ergos v. Pempton*, 92-0306 (La. 1992), 606 So. 2d 780, 786; *see also Great Sw. Fire Ins. Co. v. CNA Ins. Co.*, 89-1938 (La. 3/12/90), 557 So. 2d 966, 968 (finding solidarity between a liability insurer and an excess liability insurer).

In *Fertitta v. Allstate Ins. Co.*, the Louisiana Supreme Court explained that "the uninsured motorist carrier is solidarily liable with the tortfeasor because both obligors are obliged to the same thing so that each obligor may be compelled for the whole." 418 So. 2d at 162. In the context of a judgment, the Louisiana Supreme Court further explained that a "solidary obligation between the tortfeasor and the victim's uninsured motorist carrier may arise either when the tortfeasor is uninsured or when the tortfeasor's liability coverage is less than the amount of damages sustained by the tort victim." *Id.* (noting that *Fertitta* "involves damages caused by an underinsured tortfeasor.").

Here, neither party disputes that Smith's final judgment for damages created a solidary obligation between Indian Harbor, Smith's underinsured motorist carrier, and Clear Blue, the liability insurer of Ceasar. Def.'s Opp'n Mem., Record Document

10

31 at 17; Pl.'s Mot., R. Doc 26-1, at 8; *see also Kelly*, 169 So. 3d at 337 (holding liability insurer who acted in bad faith liable for the tortfeasor's excess judgment). Smith's final judgment explicitly held liable "Defendants, Stanley Ceasar, Jr. d/b/a Ceasar's Dump Truck Service and Indian Harbor Insurance Company, jointly, severally, and *in solido* in the amount of…$3,552,113.91." Record Document 1-2 at 2.

Because a solidary obligation exists between a tortfeasor's liability insurer and a tort victim's underinsured motorist carrier, the Louisiana Supreme Court has held that the liability insurer is entitled to a credit for the payments of the underinsured motorist carrier. In *Fertitta*, the Louisiana Supreme Court considered:

> Whether the tort victim's judgment against the tortfeasor for the full amount of the victim's damages should be reduced by the amount of the victim's pretrial settlement with his underinsured motorist carrier, when the latter as part of the settlement has waived any right of reimbursement or subrogation.

462 So. 2d at 161. The Louisiana Supreme Court concluded that the tortfeasor and his liability insurer were entitled to a credit for the payment of the underinsured motorist carrier. *Id.* at 164 ("We therefore conclude that the $32,000 payment on the solidary obligation by State Farm must be imputed to the debt owed by McCarron, the other solidary obligor."). The Louisiana Supreme Court reasoned:

> [T]he Civil Code expressly provides that payment by one solidary obligor exonerates the other toward the creditor to the extent of that payment, and the solidary obligor who makes the payment cannot by agreement with the creditor affect the right of the other solidary obligor to exoneration to the extent of the payment. *Id.*

11

Nevertheless, Smith has argued that a liability insurer is only entitled to a credit for the payment of an underinsured motorist carrier when the underinsured motorist carrier has waived its right of subrogation. Record Document 26-1 at 9. In support, Smith relies upon two Louisiana appellate court decisions, *Bullock v. Harrell*, 94-515 (La. App. 5 Cir. 11/29/94), 646 So. 2d 1181 and *Couvillion v. Shelter Mut. Ins. Co.*, 95-1186 (La. App. 1 Cir. 4/4/96), 672 So. 2d 277. Record Document 26-1 at 9.

In *Bullock v. Harrell*, the Louisiana Fifth Circuit Court of Appeal affirmed a trial court judgment that refused to provide a liability insurer with a credit for the payment of the victim's uninsured carrier. 646 So. 2d at 1182. In so doing, the court said that under *Fertitta* "if the tortfeasor and uninsured motorist carrier are solidarily liable, payments made by the UM carrier can be applied as an offset to a subsequent judgment rendered against the tortfeasor *provided the UM carrier has waived subrogation rights*." *Id.* The court reasoned the liability insurer was not entitled to a credit for the underinsured motorist carrier's payment because "there is absolutely no evidence in the actual trial record that [UM carrier] waived subrogation or reimbursement rights." *Id.* The court concluded: "[n]o waiver, no *Fertitta*." *Id.*

In *Couvillion v. Shelter Mut. Ins. Co.*, the Louisiana First Circuit Court of Appeal held that a liability insurer was not entitled to a credit for the prior payment of a victim's uninsured motorist carrier. 672 So. 2d at 283. The court reasoned that *Fertitta* meant payments of an underinsured motorist carrier "could in some situations be imputed to the debt owed by the tortfeasor as the result of a subsequent

12

judgment[.]" *Id.* The court then stated that "[u]nder the holding of *Fertitta* a tortfeasor is not entitled to an offset or credit in the absence of evidence that the UM carrier waived its subrogation or reimbursement rights." *Id.* Applying that standard to the facts of *Couvillion*, the court held: "[s]ince the record in the present case is devoid of evidence of the required waiver by plaintiffs' UM carrier, Borden's claim for a credit for the payment made by plaintiff's UM carrier must fail." *Id.*

According to Smith, these decisions, *Fertitta*, *Bullock*, and *Couvillion*, have established a "clear" rule in Louisiana that a tortfeasor or his liability insurer cannot claim a credit for an underinsured motorist payment unless the underinsured motorist carrier has waived its subrogation right. Record Document 26-1 at 8.

The Louisiana Supreme Court has not addressed the situation presented in *Bullock* and *Couvillion* where no waiver of subrogation existed. After *Fertitta*, at least one Louisiana appellate court has provided a liability insurer with a credit for the prior payment of an underinsured motorist carrier without addressing whether a waiver of subrogation existed. *E.g.*, *Jabbia v. Sanders*, 85-1049 (La. App. 3 Cir. 10/8/86), 499 So. 2d 1070, 1072-73. Moreover, even in *Bullock*, despite declaring "[n]o waiver, no *Fertitta*[,]", the appellate court "lowered the judgment" to avoid a double recovery for the plaintiff. 646 So. 2d at 1182. Thus, even though no waiver of subrogation existed, the *Bullock* court gave the liability insurer the same relief that a credit would have provided. *Albert v. Farm Bureau Ins. Co.* 05-2496 (La. 10/17/06), 940 So. 2d 620, 622 ("Louisiana law does not allow for double recovery of the same element of damages.").

In this case, the Court need not declare such a bright-line rule exists, because assuming it does, a genuine dispute of material fact exists whether Indian Harbor still has a right of subrogation.

Under Louisiana law, subrogation is a "legal fiction" that substitutes "one person to the rights of another." *A. Copeland Enter., Inc. v. Slidell Mem'l Hosp.*, 94-2011 (La. 6/30/95), 657 So. 2d 1292, 1296 (citing La. Civ. Code Art. 1825). Generally, an underinsured motorist carrier who makes payment under its policy to its insured becomes subrogated to the insured's right against the tortfeasor and the tortfeasor's insurer. *Bosch v. Cummings*, 87-2020 (La. 2/29/88), 520 So. 2d 721, 723. Here, because Indian Harbor paid underinsured motorist benefits to Smith under its policy, Indian Harbor became subrogated to Smith's rights against Ceasar through operation of law. *Bosch*, 520 So. 2d at 723. Accordingly, Indian Harbor could have pursued Ceasar for the underinsured motorist benefits it paid Smith.

However, Clear Blue argued that Indian Harbor waived its right of subrogation in the Receipt and Release agreement between itself and Smith. Record Document 36 at 2. The Court finds that the Receipt and Release agreement between Indian Harbor and Smith is ambiguous, and a genuine issue of fact exists whether Indian Harbor intended to waive its right of subrogation.

Under Louisiana Civil Code Article 2045, contract interpretation "is the determination of the common intent of the parties." A contract is ambiguous when it "lacks a provision bearing on that issue, the terms of a written contract are susceptible to more than one interpretation, there is uncertainty or ambiguity as to

14

its provisions, or the intent of the parties cannot be ascertained from the language employed." *Campbell v. Melton*, 2001-2578 (La. 2002), 817 So. 2d 69, 75. Interpretation of an ambiguous contract is a question of fact. *Carpenters Amend. & Restated Health Ben. Fund v. Holleman Const. Co. Inc.*, 751 F.2d 763, 764 (5th Cir. 1985).

Here, the Receipt and Release agreement is ambiguous because it did not contain a provision that explicitly addressed Indian Harbor's right of subrogation. Moreover, the two provisions of the Receipt and Release that might relate to Indian Harbor's right of subrogation conflict. First, a recital of the Receipt and Release stated that the agreement: "releases and terminates all rights, obligations and liabilities of [Indian Harbor]." Record Document 31-13 at 1. Under this recital alone, Indian Harbor may have released its right of subrogation. However, the second provision provided that the Receipt and Release should not "be construed as a waiver, modification or retraction of the positions of the parties relative to the interpretation and application of any insurance policy issued by [Indian Harbor]." *Id.* Under this second provision, Indian Harbor arguably disclaims releasing its right of subrogation.

Because the Receipt and Release agreement is ambiguous, external evidence is permissible to prove the intent of the contracting parties. *Campbell*, 817 So. 2d at 75. For example, in *Howard v. United Services Auto. Ass'n*, the Louisiana First Circuit Court of Appeal held that a liability insurer was entitled to a credit for the prior payment of an underinsured motorist carrier. 2014-1429 (La. App. 1 Cir. 7/22/15), 180 So. 3d 384, 400-01. There, the court determined that a waiver of subrogation existed

because the liability insurer produced a letter from the underinsured motorist carrier's representative that stated the underinsured motorist carrier "had no intention of pursuing recovery of the amounts paid to plaintiffs, thus, waiving any right of subrogation it may have against any other party liable for plaintiffs' damages." *Id.* at 400.

In this case, Clear Blue has not produced an affidavit or other evidence from Indian Harbor itself that states Indian Harbor has waived its right of subrogation. But discovery remains open and such evidence may develop during Clear Blue's investigation of the Receipt and Release. *See* Record Document 36 at 2 (requesting "additional time to conduct discovery as to Indian Harbor as to any other documents that may be in existence.").

Even without evidence from Indian Harbor, though, Clear Blue has pointed to specific facts that create a genuine dispute whether Indian Harbor waived its right of subrogation. Specifically, in at least two discovery responses, Smith averred that Indian Harbor did not reserve any subrogation right against Ceasar:

| Interrogatory No. 3: | Did Indian Harbor Insurance Company reserve any subrogation rights or reimbursement rights against Stanley Ceasar, Jr. for any payment made to Plaintiffs in connection with trial court judgment in the underlying Matter? |
|---|---|
| Answer: | No. Record Document 31-14 at 3. |

16

| Request for Production No. 7: | Please provide any and all documents… wherein Indian Harbor Insurance Company reserved subrogation rights or reimbursement rights for any payment made to Plaintiffs in connection with trial court judgment in the underlying matter. |
|---|---|
| Response: | None. Record Document 31-15 at 4. |

Because Smith "stands in Ceasar's shoes" and does not seek to recover for his own damages, but instead asserts Ceasar's right of action, any subrogation rights depend on those that exist against Ceasar. Thus, if Indian Harbor did not reserve a subrogation right against Ceasar, as Smith averred in his discovery responses, it likewise did not retain such a right against Smith.

Accordingly, assuming a waiver of subrogation is needed, the Court finds that Clear Blue has pointed to specific facts that create a genuine dispute whether Indian Harbor waived its subrogation right. Smith's motion for partial summary judgment is **DENIED**.

**DONE AND SIGNED** at Shreveport, Louisiana, this 17th day of March, 2026.

**ALEXANDER C. VAN HOOK**
**UNITED STATES DISTRICT JUDGE**

17